# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

No. 11-2328

---

## UNITED STATES,

*Plaintiff-Appellee,*

*v.*

## DTE ENERGY CORP.

*Defendant-Appellant.*

---

On Appeal From the U.S. District Court For The
Eastern District of Michigan, No. 10-13101 (Hon.
Bernard A. Friedman).

---

## BRIEF *AMICUS CURIAE* OF NATURAL RESOURCES DEFENSE COUNCIL, INC. AND SIERRA CLUB, IN SUPPORT OF PLAINTIFF-APPELLEE UNITED STATES, SUPPORTING REVERSAL

Jessie J. Rossman
Natural Resources Defense Council
2 North Riverside Plaza, Suite 2250
Chicago, IL 60606
(312) 651-7923

Counsel for *Amicus Curiae* Natural Resources Defense Council, Inc. & Sierra Club

*Of Counsel:*
Shannon Fisk
Earthjustice
156 William Street, Suite 800
New York, NY 10038

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P 26.1 and Fed. R. App. P. 29(c)(1),  Sierra Club states that it is not a subsidiary or affiliate of a publicly owned corporation. Pursuant to Fed. R. App. P 26.1 and Fed. R. App. P. 29(c)(1), Natural Resources Defense Council states that it is not a subsidiary or affiliate of a publicly owned corporation.

## <u>TABLE OF CONTENTS</u>

I.    AMICI'S INTERESTS IN THIS PROCEEDING. ........................................2

II.   ARGUMENT................................................................................................4

    A.    THE DISTRICT COURT'S RULING RUNS CONTRARY
          TO CONGRESS' INTENT THAT COAL-FIRED POWER
          PLANTS EVENTUALLY BE REQUIRED TO INSTALL
          MODERN POLLUTION CONTROLS ................................................7

    B.    THE DISTRICT COURT'S RULING RUNS COUNTER TO
          THE EFFICIENCY CREATED BY THE PRE-CONSTRUCTION
          FOCUS OF THE CAA'S NSR REQUIREMENTS ...........................10

    C.    THE DISTRICT COURT'S DECISION ADVERSELY
          IMPACTS PUBLIC PARTICIPATION IN NSR PERMITTING
          AND ENFORCEMENT.....................................................................13

III.  CONCLUSION...........................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Alabama Power Co. v. Costle*,
    636 F.2d 323 (D.C. Cir. 1979)......................................................5,7

*Friends of the Earth v. Carey*,
    535 F.2d 165 (2d Cir. 1976) ................................... 13-14

*In re Tenn. Valley Auth*,
    9 E.A.D. 357 (EAB 2000) ..............................................8

*National-Southwire Aluminum Co. v. EPA*,
    838 F.2d 835 (6th Cir. 1988) ........................................11

*Natural Resources Defense Council, Inc. v. Train*,
    510 F.2d 692 (D.C. Cir. 1975).......................................14

*United States v. Ohio Edison Co.*,
    276 F.Supp.2d 829 (S.D. Ohio 2003)..........................5,7

*United States v. S. Ind. Gas & Elec.*,
    Case No. IP99-1692-C-M/F, 2002 WL 1629817 (S.D. Ind. 2002)...............11

*United States v. Southern Indiana Gas & Elec. Co.*,
    245 F.Supp.2d 994 (S.D. Ind. 2003) ............................7

*Weiler v. Chatham Forest Product, Inc.*,
    392 F.3d 532 (2d Cir. 2004) .......................................14

*Wisconsin Elec. Power Co. v. Reilly*,
    893 F.2d 901(7th Cir. 1990) ...............................7,8,11,12

## STATUTES

42 U.S.C. § 7604(a)(3)...............................................13

42 U.S.C. § 7470(5) ...................................................13

**OTHER AUTHORITIES**

H.R.Rep. No. 91-1146, 91st Cong., 2d Sess. (1970) .................................................8

S.Rep. No. 1196, 91st Cong., 2d Sess. (1970).....................................................13,14

iii

This proceeding involves the important question of whether the pollution control requirements of the Clean Air Act's ("CAA" or "Act") New Source Review ("NSR") program will be enforced against aging coal-fired power plants that have evaded those requirements for decades. In its 1977 amendments to the CAA, the U.S. Congress struck a balance between public health and economics by requiring new pollution sources to install modern pollution controls but allowing existing facilities to defer pollution control upgrades until they invested in major modifications. At the time, it was expected that these "grandfathered" sources would soon retire, but in the event they elected to undertake retrofits and continue operating, they would be required under the NSR program to catch up with modern standards and install state-of-the-art pollution controls.

The District Court opinion overturns the balance struck by Congress and, if affirmed, could transform Congress' temporary NSR grandfathering provision into a virtually permanent exemption from modern pollution control requirements. Such a result is contrary to law and would deprive the public of the significant public health benefits that the NSR provisions are intended to provide. Therefore, amici Natural Resources Defense Council ("NRDC") and Sierra Club urge this Court to reverse the District Court decision and remand the proceeding so that the enforcement action against Detroit Edison's aging Monroe Power Plant can proceed.

## I.    AMICI'S INTERESTS IN THIS PROCEEDING.

NRDC is a national, not-for-profit membership organization committed to the preservation, protection, and defense of the environment, public health, and natural resources.  For more than forty years, NRDC has engaged in scientific analysis, public education, advocacy, and litigation on a wide range of environmental and health issues.  NRDC is active in efforts to reduce the threats to human health and the environment from air pollution emitted by coal-fired power plants.  NRDC has more than 357,000 members nationwide, including more than 9,500 members in Michigan.

Sierra Club, an incorporated not-for-profit, is the nation's oldest and largest grassroots environmental organization. Its mission is to preserve, protect, and enhance the natural environment. Sierra Club has more than 619,000 members nationwide, including more than 17,200 members in Michigan.  Sierra Club works to protect and improve air quality and to promote the development of energy efficiency and renewable energy sources.  Sierra Club's Beyond Coal Campaign seeks to retire old coal plants that are the worst contributors to health-harming soot and smog pollution and replace them with cleaner energy solutions.

NRDC and Sierra Club (collectively "Citizen Groups") both have long histories of working to reduce air pollution, seek the installation of controls on aging coal-fired power plants, and defend and strengthen the CAA.  Citizen

2

Groups have defended the NSR program from legislative and litigation attempts to weaken or eliminate it, and they have challenged inadequate NSR regulations. In addition, Citizen Groups were parties in the federal government's landmark NSR enforcement litigation against American Electric Power's coal-fired power plant fleet, and Sierra Club has over the past five years pursued NSR enforcement actions against coal plants in Michigan, Ohio, Wisconsin, and other states.

In Michigan, Citizen Groups have sought to ensure compliance with and enforcement of the requirements of the NSR program through CAA Title V Renewable Operating Permit proceedings. In recent years Citizen Groups have filed comments on draft Title V permit renewals for Detroit Edison's Belle River/St. Clair, Trenton Channel, and River Rouge plants, and Consumers Energy's B.C. Cobb plant, identifying modifications at each of these facilities that Citizen Groups believe should have triggered NSR requirements. Citizen Groups have petitioned U.S. EPA to object to two of these permits that were finalized.

Citizen Groups were intervening parties in this proceeding when it was before the District Court and strongly believe that the District Court's holding is inconsistent with the requirements of the CAA and, if affirmed by this Court, could render the NSR provisions virtually unenforceable. Unless this Court reverses the District Court decision, it is likely that more coal plants will continue to operate without modern pollution controls, and Citizen Groups' members who live near or

3

downwind of such coal plants would be adversely impacted by the continued pollution from plants such as Monroe.

Amici filed a motion for leave to file this brief. Neither party's counsel authored the brief in whole or in part. No person other than amici, their members or counsel contributed money intended to fund preparing or submitting the brief.

## II.    ARGUMENT.

The NSR provisions of the CAA have been an important tool for protecting public health from air pollution. The largest source category of such pollution is the nation's more than 400 coal-fired power plants, including Detroit Edison's Monroe plant. Throughout its 35-year history, the NSR program has in many instances led owners of such coal plants to install modern pollution controls that reduce emissions by 90 to 95 percent or more.[1] The benefits to public health of such emission reductions are immense,[2] and the jobs created by pollution control installations can number in the hundreds or more at each plant.

---

[1] *See, e.g.*, U.S. EPA's Coal-Fired Power Plant Enforcement Initiative, http://www.epa.gov/compliance/resources/cases/civil/caa/coal/index.html, which lists twenty-three utilities with which the U.S. EPA has entered into enforceable agreements to install pollution controls on various aging coal units stemming out of NSR enforcement actions.

[2] *Id*. One of the twenty-three enforceable NSR agreements U.S. EPA has entered to install pollution controls is with the Tennessee Valley Authority. U.S. EPA estimates that that the emission reductions from that settlement alone would avoid 1,200 to 3,000 premature deaths every year.

Despite Congress' intent that NSR grandfathering be temporary, *Alabama Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979), the common industry practice of undertaking unpermitted and often surreptitious modifications, *U.S. v. Ohio Edison Co.*, 276 F.Supp.2d 829, 832-34 (S.D. Ohio 2003) (detailing industry's efforts to influence government action regarding NSR), has enabled many coal plants throughout the country to avoid NSR requirements for 35 years. These coal plants continue to emit annually tens of thousands of tons of harmful sulfur dioxide, nitrogen oxides, and other pollutants decades after the plants surpassed their expected operating lives, the NSR requirements went into effect, and pollution controls became available.

In this proceeding, Detroit Edison offers a novel, and fatally flawed, theory for why NSR grandfathering of its Monroe coal plant should be extended even further. The company claims that a letter it mailed to the Michigan Department of Environmental Quality ("MDEQ") the day before Detroit Edison commenced an unprecedented $65 million overhaul of the Unit 2 boiler at the Monroe coal plant -- in which the company made an unsupported and apparently unsupportable claim that the overhaul would not lead to an emissions increase -- forecloses any evaluation of whether its massive rebuilding of Monroe Unit 2 reasonably should have been projected to cause an NSR-triggering emissions increase. Instead, Detroit Edison contends, and the District Court held, that NSR requirements can be

enforced only if Detroit Edison reports an actual post-project emissions increase in one of the five years after the 2010 overhaul.  This restrictive reading is purportedly based on the U.S. EPA's 2002 NSR regulations, which established post-project emissions reporting requirements for sources that make a pre-project determination that no significant emissions increase would occur as the result of a planned modification to an existing pollution source.

In its opening brief, the United States demonstrates how the District Court's holding is inconsistent with the requirements of the Clean Air Act, the 2002 NSR regulations, and the U.S. EPA's contemporaneous and current interpretation of those regulations.  In addition, the United States explains how the Detroit Edison arguments adopted by the District Court would make NSR provisions virtually unenforceable, as it would be easy for any utility to make a pre-construction claim that no emissions increase will occur and then manipulate the operation of its modified unit to make sure no emissions increase occurs for five years.

Citizen Groups strongly support the United States' position in this proceeding and submit this amicus brief to underline how the District Court's ruling also conflicts with three primary principles that have guided the application of the NSR program throughout its history.  First, the NSR program is designed to ensure that all major pollution sources eventually install modern pollution controls, rather than allowing indefinite uncontrolled operations of such plants.  Second,

NSR is a pre-construction program that seeks to ensure that pollution controls are installed at the same time as plant modifications in order to take advantage of the money-saving efficiencies that result from such coordination. Third, the CAA establishes a strong policy in favor of active citizen involvement in permitting and enforcement of CAA standards. The interpretation of the 2002 NSR regulations offered by Detroit Edison and accepted by the District Court eviscerates each of these core NSR principles, and it should be rejected by this Court.

## A. THE DISTRICT COURT'S RULING RUNS CONTRARY TO CONGRESS' INTENT THAT COAL-FIRED POWER PLANTS EVENTUALLY BE REQUIRED TO INSTALL MODERN POLLUTION CONTROLS.

By requiring the installation of modern pollution controls on any existing pollution source carrying out a physical change that increases annual emissions of sulfur dioxide or nitrogen oxides by 40 tons or more, Congress intended the NSR grandfathering of existing sources to be temporary. Indeed, numerous courts and the U.S. Environmental Appeals Board have rejected interpretations of NSR statutory provisions or regulations that would "open vistas of indefinite immunity from the provisions of" NSR permitting. *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990) [hereinafter "*WEPCO*"]; *Ohio Edison Co.*, 276 F.Supp.2d at 855; *U.S. v. Southern Indiana Gas & Elec. Co.*, 245 F.Supp.2d 994, 1009-1010 (S.D. Ind. 2003); *see also Alabama Power Co.*, 636 F.2d at 400 (NSR grandfathering provisions should not "constitute a perpetual immunity from all

7

standards under the PSD program"); *In re Tenn. Valley Auth*, 9 E.A.D. 357, 395-96 (EAB 2000) (same). The CAA amendments were enacted to "speed up, expand, and intensify the war against air pollution." H.R.Rep. No. 91-1146, 91st Cong., 2d Sess. 1, 1, *reprinted in* 1970 U.S.Code Cong. & Admin.News 5356, 5356. There is "no reason to believe" that Congress intended to allow that the application of NSR requirements "be postponed into the indefinite future." *WEPCO*, 893 F.2d at 909.

The District Court opinion, however, if affirmed by this Court, would allow exactly such postponement "into the indefinite future." *Id*. Under the District Court's interpretation of the 2002 NSR regulations, an owner of a major source of pollution could avoid pre-construction focused NSR enforcement simply by mailing a letter claiming no significant emissions increase will result to a state permitting agency at least one day in advance of commencing a modification of the source. Under this interpretation, NSR enforcement could only occur if there is a significant increase in actual post-project annual emissions within five years of the project. But any utility could avoid such a post-project emissions increase for five years by running the modified unit fewer hours or at a lower capacity, and/or temporarily using a less-polluting coal, and then would be free to run the plant at will without modern pollution controls once the five-year reporting period ended. In fact, as the United States has documented (U.S. Br. at 32-33), Detroit Edison has a plan to do exactly that at Monroe Unit 2. This Court should not affirm the

8

District Court's holding, which would allow Detroit Edison, or any other utility, to claim for itself "indefinite immunity" from NSR requirements, in direct contravention of Congress' intent that all existing sources would eventually be required to install modern pollution controls.

It is important to note that the "indefinite immunity" that the affirmation of the District Court's holding would authorize is not just with regards to Monroe Unit 2. There are numerous coal plants throughout the country that lack modern pollution controls and either have undertaken or are likely to undertake NSR-triggering major modifications. For example, an October 2009 U.S. EPA report found that in 2009 only 50% of the total installed coal capacity in the U.S. had flue gas desulfurization ("FGD"), which is the modern pollution control for sulfur dioxide.[3] The U.S. EPA report projects an increase in the proportion of coal capacity with FGDs, but even by 2025 the proportion of existing coal capacity with FGDs is expected to only rise to 78%.

Many of the coal units that lack modern pollution controls are in Michigan. U.S. EPA issued a Notice of Violation ("NOV") in July 2009 that identified four other Detroit Edison coal plants, consisting of fifteen units that commenced operation in the 1950s, 1960s, or 1980s, at which the agency found major

---

[3] U.S. EPA, Steam Electric Power Generating Point Source Category: Final Detailed Study Report, EPA 821-R-09-008 (Oct. 2009), at 4-5, *available at* http://water.epa.gov/scitech/wastetech/guide/upload/finalreport.pdf.

modifications had occurred without modern pollution controls being installed.[4]

Similar NOVs have been sent to utilities throughout the country, including to the

other major Michigan public utility, Consumers Energy,[5] at which U.S. EPA found

that major modifications were made to seven coal plant units that commenced

operations in the 1950s and 1960s and still mostly lack modern pollution controls.

If the District Court decision were affirmed by this Court and followed by other

courts, the opening up of "vistas of indefinite immunity" could make it easier for

coal plants throughout the country to evade NSR requirements.

## B. THE DISTRICT COURT'S RULING RUNS COUNTER TO THE EFFICIENCY CREATED BY THE PRE-CONSTRUCTION FOCUS OF THE CAA'S NSR REQUIREMENTS.

As the United States explains in its opening brief (U.S. Br. at 26-30), NSR is

a pre-construction program pursuant to which a power plant operator is required to

determine the need for an NSR permit and, if necessary, to obtain such permit

before commencing a construction project at the plant. As such, NSR

requirements can be enforced in advance of construction commencing. Even if

enforcement comes after construction is completed, an enforcement action

typically focuses on whether the pre-construction projection of post-construction

---

[4] The NOV is available at
http://yosemite.epa.gov/r5/r5ard.nsf/fa120e741359b6cf8625759a00455537/2bcbf7
6030291bc5862576010068a6ce/$FILE/ard-015942.pdf (visited Feb. 24, 2012).
[5] The NOV is available at
http://yosemite.epa.gov/r5/r5ard.nsf/6a2817f3f71298e28625759a0045ba96/511744
7da4098d158625756e0065f863/$FILE/ard-014993.pdf (visited Feb. 23, 2012).

emissions should have predicted a significant emissions increase, rather than evaluating actual post-construction emissions data. *Id*. at 29-30 (citing *United States v. S. Ind. Gas & Elec.*, Case No. IP99-1692-C-M/F, 2002 WL 1629817, at *2-*3 (S.D. Ind. 2002) [hereinafter "*SIGECO*"]). The District Court's ruling, which limits enforcement against Monroe Unit 2 to potential violations that may be identified through future actual post-construction emissions data, is contrary to and inconsistent with the CAA's strong pre-construction focus.

The CAA's pre-construction focus stems from the same concern about cost-effectiveness that the NSR grandfathering provision does. The NSR provisions seek to "ensure that pollution control measures are undertaken when they can be most effective." *WEPCO*, 893 F.2d at 909 (quoting *National-Southwire Aluminum Co. v. EPA*, 838 F.2d 835, 843 (6th Cir. 1988) (Boggs, J. dissenting)). For new sources, the most cost-effective time to install controls is when the new source is constructed and, therefore, the CAA sets forth a pre-construction permitting process to determine what controls need to be installed. *WEPCO*, 893 F.2d at 909. For plants in existence in 1977, installing controls when no other construction was being undertaken was not the most cost-effective approach, especially if such existing source was going to be retired in the near future. *Id*. However, if a major modification is already being planned for an existing source, installing pollution controls at the same time as that modification would be more cost-effective. *Id*.

11

Therefore, when the NSR grandfathering for an existing source ends under the CAA, pre-construction permitting should be carried out as a cost-effective approach for cleaning up or replacing that source. *Id*.

The District Court decision, however, is inconsistent with this effort to "ensure that pollution control measures are undertaken when they can be most effective." *WEPCO*, 893 F.2d at 909. In the place of a careful pre-construction NSR determination, the District Court decision allows a source owner or operator to avoid meaningful pre-construction NSR review by simply submitting a pre-construction letter to the MDEQ claiming that an expected plant modification would not trigger NSR. If the owner or operator satisfies that paperwork requirement, then NSR enforcement could occur only on the basis of actual post-construction annual emissions. By the time such actual emissions data is collected, the cost-effectiveness that could have accrued from an existing coal plant installing pollution controls at the same time as an already planned major modification has been lost. Yet the District Court's flawed application of the 2002 NSR regulations would encourage exactly that outcome of a source owner avoiding pre-construction review with the filing of a boilerplate letter, and then waiting to see if post-construction emissions increases could be avoided. This approach is not only contrary to the pre-construction focus of the NSR program, but also defeats the efficiencies that could be created through a proper pre-construction focus.

12

## C. THE DISTRICT COURT'S DECISION ADVERSELY IMPACTS PUBLIC PARTICIPATION IN NSR PERMITTING AND ENFORCEMENT.

Citizen participation is a central component of the CAA that helps ensure

that the Act's provisions are enforced.  The CAA includes a citizen suit provision

that authorizes private citizens to bring a federal court action "against any person

who proposes to construct or constructs any new or modified major emitting

facility without a permit required" by the pre-construction permitting provisions of

the Act.  42 U.S.C. § 7604(a)(3).  The Act also seeks to assure that any permitting

decision must provide adequate "opportunities for informed public participation in

the decision-making process."  42 U.S.C. § 7470(5).

The releant legislative history emphasizes the import of, and need for, this

public participation. As the Senate Committee on Public Works reported in 1970:

> Government initiative in seeking enforcement under the Clean Air Act has
> been restrained. Authorizing citizens to bring suits for violations of
> standards should motivate governmental agencies charged with the
> responsibility to bring enforcement and abatement proceedings.

S.Rep. No. 1196, 91st Cong., 2d Sess., 36-37 (1970).  The Committee explained

that individuals who initiated legitimate challenges under this citizen suit provision

would be "performing a public service." *Id.* at 38.

Reflecting this clear legislative intent, the courts have found that "the citizen

suits provision reflected a deliberate choice by Congress to widen citizen access to

the courts, as a supplemental and effective assurance that the Act would be

13

implemented and enforced." *Friends of the Earth v. Carey*, 535 F.2d 165, 172

(2d Cir. 1976) (quoting *Natural Resources Defense Council, Inc. v. Train*, 510

F.2d 692, 700 (D.C. Cir. 1975); *see also Weiler v. Chatham Forest Product, Inc.*,

392 F.3d 532, 536 (2d Cir. 2004) ("[W]e note as a guiding principle that citizen

suits play an important role in the Act's enforcement scheme.").  Congress

intended that these citizen suits would serve both to motivate government action

and to enforce the Act's provisions on their own.  *See Weiler*, 392 F.3d at 536.

     If affirmed, the District Court decision could frustrate Citizen Groups'

statutorily authorized ability to play a meaningful role in PSD and NSR

implementation and enforcement.  By waiting to mail a notice letter regarding the

$65 million boiler overhaul at Monroe Unit 2 until the day before the project

began, Detroit Edison prevented Citizen Groups' from obtaining critical

information  in a timely manner and all but ensured that a pre-construction process

with the statutorily identified public participation process could not occur here.

This approach conflicts with the Senate Committee's determination that

> The information and other disclosure obligations required throughout the bill
> are important to the operation of this provision. The Secretary would have a
> special duty to make meaningful information on emitting sources available
> to the public on a timely basis.

S.Rep. No. 1196, 91st Cong., 2d Sess., 38 (1970).  Moreover, private citizens are

plainly authorized to challenge an unpermitted major modification either before or

after it is constructed on the same bases as the United States describes in its brief.

14

(U.S. Br. at 26-30). If affirmed, the District Court opinion would not only obviate the United States' enforcement authority, but also improperly interfere with the right of private citizens to pursue their own legal challenges to NSR violations.

## III.    CONCLUSION

For the foregoing reasons, and those laid out in the United States' brief, NRDC and Sierra Club respectfully request that the Court reverse the District Court decision and remand the proceeding so that the enforcement action against Detroit Edison's aging Monroe Power Plant can proceed.

Respectfully submitted,

/s/ Jessie J. Rossman
Natural Resources Defense Council
2 North Riverside Plaza, Suite 2250
Chicago, IL 60606
(312) 651-7923

Attorney *Amicus Curiae* Natural Resources
Defense Council, Inc. and Sierra Club

*Of Counsel:*
/s/ Shannon Fisk
Earth justice
156 William Street, Suite 800
New York, NY 10038
(212) 791-1881 ex. 8239

DATE:      February 24, 2012

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that, on this 24th day of February, 2012, I caused the foregoing Brief Amicus Curiae of Natural Resources Defense Council and Sierra Club in Support of Plaintiff-Appellee United States to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit through the Court's CM/ECF system. All registered CM/ECF users will be served by the Court's CM/ECF system.

DATE: February 24, 2012                    <u>/s/ Jessie J. Rossman</u>
                                           Jessie J. Rossman
                                           Natural Resources Defense Council
                                           2 North Riverside Plaza, Suite 2250
                                           Chicago, IL 60606
                                           (312) 651 7923